UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

ROBERT JEHLING,                        §
                                       §
          Plaintiff,                   §
                                       §
v.                                     §        CIVIL ACTION NO. 3:11-CV-1258-B
                                       §
A.H. BELO CORPORATION and              §
THE DALLAS MORNING NEWS, INC.          §
d/b/a THE DALLAS MORNING NEWS,         §
                                       §
          Defendants.                  §

<u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is Defendants The Dallas Morning News and A.H. Belo Corporation's

Motion for Summary Judgment (doc. 73). For the reasons stated below, Defendants' Motion is

**GRANTED**.

**I.**

**BACKGROUND**[1]

This is an employment discrimination case, with related claims for breach of contract and

defamation, brought by Plaintiff Robert Jehling against his former employer Defendant The Dallas

Morning News ("DMN") and its parent corporation Defendant A.H. Belo Corporation ("A.H.

Belo"). Both DMN and A.H. Belo are Delaware corporations authorized to do business in Texas.

DMN is wholly owned by A.H. Belo and is in the business of publishing and distributing news

through *The Dallas Morning News* newspaper. Jehling is a 40 year old, Hispanic male. He is suing

_____

[1]The Court takes its factual account from the uncontested facts contained in the summary
judgment record. Any contested fact is identified as the allegation of a particular party.

Defendants for employment discrimination under Title VII, 42 U.S.C. § 2000e-2; violation of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*; breach of contract; and defamation. Jehling's claims stem from what he maintains was a racially biased investigation by DMN into Jehling's acquisition of DMN's confidential salary information as well other allegedly discriminatory behavior by DMN that led to his ultimate termination.

Jehling was employed in the sales department of DMN from November 1, 2008, until his termination on October 4, 2010. Jehling initially worked as the Senior Director of Online Sales, and later, after his department was reorganized, he was promoted and "rehired" as the Manager of SMB (small and medium business teams), Retail Interactive (DMN's digital sales team), and Inside Sales team (inside call center), and as the Publisher of *Neighborsgo* (a local digital newspaper).Doc 74-4, Letter Ex. A-2; Doc. 74-12, Carr Aff. Ex. C ¶ 6. The initial letter that Jehling received when he first started working for DMN in 2008, the letter that he received when he was "rehired" as the Manager of SMB in 2009, and the DMN employee handbook all stated that Jehling's employment was at-will. Doc 74-3, Letter Ex. A-1; Doc 74-4, Letter Ex. A-2; Doc 74-5, Handbook Ex. A-3, at 4. Both of the letters also stated that they did "not create a binding employment contract between you and *The Dallas Morning News.*" Doc 74-3, Letter Ex. A-1; Doc 74-4, Letter Ex. A-2.

The 2009 letter also stated that Jehling "will be a participant in the company's Incentive Plan for General Managers (IPGM)," which made him "eligible for a target bonus of $80,000 to be paid quarterly." Doc 74-4, Letter Ex. A-2. These bonuses were contingent on meeting certain financial targets and also entitled him to a "2% bonus of all revenue over goal." *Id.* Jehling performed well in his role as Manager of SMB, receiving commendations from the company for his performance and

bonuses through the IPGM. *Id.*; Doc. 82, Pl.'s Resp. 15; Doc 74-6, Letter Ex. A-2; Doc. 74-7, Letter Ex. A-5 (letter notifying Jehling that he was Top Sales Performer).

A.       *Confidential Salary Information Released*

Sometime at the end of August 2010, a spreadsheet containing confidential salary information was placed on a shared drive on the DMN server. Doc. 83-11, Scott Dep. Ex. D, at 22. On September 28, 2010, two of Jehling's subordinates approached him with the document after it was brought to their attention. Doc. 74-16, Pullias Dep. Ex. E, at 23-24. Jehling had them print him a copy and immediately attempted to contact his supervisor, Cynthia Carr. Doc. 83-11, Scott Dep. Ex. D, at 190-91; Doc. 74-16, Pullias Dep. Ex. E, at 23-24. Although Carr was unable to meet with him, Jehling was scheduled to attend a digital initiatives meeting with her in the next 15 minutes. Doc. 82, Pl.'s Resp. 4. In the meantime, Jehling approached another general manager, Michael Mayer, to determine whether Mayer was aware of the now-accessible confidential document and to ascertain if the information in the document was accurate. Doc. 74, Defs.' Br. 5; Doc. 82, Pl's Resp. 4; Doc. 91-1, Jehling Dep. Ex. D., at 209. Jehling also claims that when he contacted Mayer, Mayer stated that he was already aware of the information and had a copy. Doc. 91-1, Jehling Dep. Ex. D., at 209.   In their one-on-one meeting, Jehling and Mayer discussed the information in the confidential salary report, including the fact that they were the two lowest paid general managers. Doc. 74-30, Mayer Dep. Ex. K, at 27-28. Mayer asserts that he did not have his own copy of the document during this first meeting with Jehling, but that someone placed a copy in his mailbox later that day. *Id.* at 25-26; Doc. 74-6, Report Ex. A-4, at DMN 079181. Jehling and Mayer both attended the digital initiatives meeting with Carr that day.

Jehling's behavior in the digital initiatives meeting seemed unusual to the others in attendance. Defendants claim that Carr pulled Jehling into a private meeting immediately after the meeting, doc. 74-11, Carr Dep., Ex. B, at 60, while Jehling claims she refused to meet with him until later that day, doc. 83-12, Jehling Dep. Ex. E, at 192-93. Both parties agree that when Carr and Jehling met, Carr asked Jehling what was wrong and he did not tell her about the confidential salary information. He told her instead that he was preoccupied by a variety of things, particularly a text message he had received about his daughter's health during the meeting. Doc. 83-9, Report Ex. B-2, at DMN 079175. Jehling insists that he asked to speak with her about a sensitive topic, but that she immediately cut him off and told him that she did not have time to speak. Doc. 83-12, Jehling Dep. Ex. E, at 195. Jehling claims that he asked her to call him on his cell phone so they could discuss the matter further, but that she never called. *Id.*

According to Defendants, following the meeting, Jehling continued to meet with Mayer throughout the day to discuss the confidential document. Doc. 74, Defs.' Br. 6; Doc. 74-30, Mayer Dep. Ex. K, at 27-28. Though Jehling and Mayer agreed to turn the information over to Carr that day, September 28, they were unable to find her. Doc. 83-9, Report Ex. B-2, at DMN 079181-079182; Doc. 74-30, Mayer Dep. Ex. K, at 32. They met with Carr the next day and revealed the existence of the confidential salary document on the server. Doc. 74-11, Carr Dep. Ex. B, at 67.

B.      *DMN Conducts Investigation*

After meeting with Jehling and Mayer, Carr spoke with other directors and supervisors, and they initiated investigations into the matter. Sandra Scott, Human Resources Director, initiated a personnel investigation to determine whether employees acted appropriately in dealing with the document. Doc. 74-6, Report Ex. A-4, at DMN079179.

Scott began conducting interviews the next day, September 30. She interviewed Michael Mayer, who indicated that a copy of the salary information appeared in his mail tray in the afternoon on September 28.   Doc. 74-6, Report Ex. A-4, at DMN079181. He also stated that after he found the report, Jehling phoned him. *Id.* He went over to Jehling's office, they discussed the matter and decided to notify Carr, but it was already after 5 p.m. and she was not in her office. *Id.* She also interviewed Jehling's subordinates, who generally confirmed the series of events related by Mayer and Jehling. *Id.* at DMN079180, DMN079183. At some point that day, Scott informed Carr that Jehling's team discovered the file on September 28 and not on the morning of September 29, as Carr had thought. *Id.* at DMN079181; Doc. 74-12, Carr. Aff. Ex. C ¶ 10.

The next morning, on October 1, Scott interviewed Jehling. Jehling disclosed how he learned about the confidential information, but claimed that he had not contacted Mayer until after Mayer had found a copy of the file in his inbox. Doc. 74-6, Report Ex. A-4, at DMN079182; Doc. 91-1, Jehling Dep. Ex. D, at 209. He said that even though he immediately went to find Carr after being notified of the information, Carr was unavailable and he was unable to meet with her later because he had scheduled meetings. *Id.* After reviewing his schedule, he acknowledged that Carr was present in the digital initiatives meeting. *Id.* He claimed that he did not speak to her about the document at that meeting because other people were around and that when she pulled him aside he was preoccupied with news from his doctor. *Id.*

Following the interview, Scott sent Jehling home pending the outcome of the investigation. He was told it would likely be completed by Monday. *Id.* at DMN079182. Scott denied that Jehling was being terminated, but expressed concern that he waited so long to report the document to Carr.

*Id.* Jehling said that he needed to speak with Carr as a follow up, but was denied an opportunity to do so. *Id.*

On Friday, October 1, after the investigation was concluded, Scott recorded in the investigation notes that Carr had decided to terminate Jehling. *Id.* at DMN079184. On Monday, October 4, Scott and Carr attempted to contact Jehling by phone twice between 11:30 a.m. and 12:30 p.m. *Id.* at DMN079185.  Jehling did not pick up, and Carr and Scott both left him messages on his voicemail. Doc. 74-2, Scott Aff. Ex. A ¶ 10; Doc. 74-12, Carr Aff. Ex. C ¶ 12. Carr and Scott then received an e-mail from Jehling at 12:29 p.m. articulating his intent to take FMLA leave. Doc. 74-10, Jehling FMLA Request Ex. A-8. The email states that Jehling would have notified Carr of his intent to take leave the previous Friday, but because he was sent home he was unable to do so. *Id.* It also states that prior to this notification, Jehling had discussed the possibility that he might need to take leave to care for his daughter. Doc. 83-12, Jehling Dep. Ex. E, at 271.[2]

After sending the e-mail, Jehling spoke with Carr on the telephone. Jehling asserts that he and Carr spoke while he was in his car heading to his attorney's office. *Id.* at 276-77.  During this conversation, Carr did not mention that she had decided to terminate him. Doc. 82, Pl.'s Resp. 29; Doc. 83-12, Jehling Dep. Ex. E, at 276-77; Doc. 74-12, Carr Aff. Ex. C ¶ 12. Jehling called Carr back once he got to his attorney's office and at that time was notified that he was being terminated for exercising poor judgment and that this decision had been reached prior to his FMLA request. Doc. 83-12, Jehling Dep. Ex. E, at 277. Scott and Carr told Jehling he was being terminated for lying in the investigation: he had claimed that he had approached his manager as soon as possible with the

---

[2] Jehling's daughter suffers from chronic microcephaly, which involves behavioral issues, seizures, speech and mobility impairments, and requires constant therapy and medication. Doc. 1, Original Pet. 3.

confidential salary information, but he did not approach Carr during the two meetings he had with her after learning about the file, including a one-on-one meeting where she specifically asked him what was wrong. Doc. 83-9, Report Ex. B-2, at DMN079184. Scott and Carr also told him that he was being terminated because Carr had concluded that Jehling had placed the confidential information in Mayer's inbox after discovering it, Doc. 74-12, Carr Aff. Ex. C ¶ 11, although Carr has since admitted that the ITS investigation into who accessed the document was limited and that someone else could have placed it in Mayer's inbox. Doc. 83-11, Carr Dep. Ex. C, at 88.

E.      *Allegations of Racism*

        In addition to claiming that the investigation related to the confidential salary information was racially-biased, Jehling points to numerous incidents that he believes demonstrate racial bias against Hispanics by Defendants and their employees and that led to his termination. First, he raises prior conflicts that he and other Hispanic employees had with another general manager, Bill Bradley. Jehling asserts that he and Bradley had an open animosity toward one another. Doc. 83-11, Carr Dep. Ex. C, at 98. He alleges that he once reported to his former supervisor that Bradley had made racially insensitive comments about Hispanic employees, but that she had told him to brush it off and to have a "thick skin." Doc. 83-12, Jehling Dep. Ex. E, at 110-11. Jehling also claims that other employees went to Carr to report racially inappropriate remarks made by Bradley; however, the other employees deny ever doing so. *Id.* at 113, 116; Doc. 74-16, Pullias Dep. Ex. E, at 40; Doc. 74-18, Inan Dep. Ex. G, at 29. Employees did at one time approach Carr about an issue between a Hispanic employee and Bradley, but Defendants insist that this incident resulted from Bradley's concerns that the employee was unethical and was stealing sales from other employees. Doc. 74-9, Letter Ex. A-7; Doc. 74-16, Pullias Dep. Ex. E, at 49; Doc. 74-30, Mayer Dep. Ex. K, at 52-53. Jehling also asserts

that Bradley had a hand in initiating an investigation against him in April 2009 regarding the theft of a $.75 patch from an Army Navy Store. Doc. 82, Pl.'s Resp. 11-12.

Jehling insists that evidence of Bradley's discriminatory behavior is significant because Bradley indirectly influenced Scott, his close friend, during the investigation of Jehling for his involvement with the confidential salary information. Jehling points to various inconsistencies in Scott's investigation report concerning the confidential salary information and argues that they evidence a bias towards him. Doc. 82, Pl.'s Resp. 9-11. Jehling also argues that the previous investigation in 2009 for allegedly stealing the $0.75 patch was partially driven by discriminatory animus, although the investigation report indicates that the investigation was spurred by other concerns besides the alleged shoplifting. *Id.* at 11-12. No disciplinary action was taken as a result of this earlier investigation, but Jehling points out that Scott brought up this prior investigation when Carr was deciding whether to terminate Jehling for his actions in relation to the confidential information. *Id.*

Jehling also asserts that his supervisors treated him differently from other non-Hispanic employees.  For instance, while an employees' relation file was created for Jehling during the shoplifting investigation, no file was ever created for Mayer, Bill Bradley, or the two associates that brought the salary information to Jehling's attention. Doc. 82, Pl.'s Resp. 13. With regards to the confidential salary information investigation, Jehling asserts that his supervisors treated Mayer differently than Jehling, even though Mayer had engaged in many of the same acts. For instance, Scott did interview Mayer in connection with the confidential salary information, but he was not suspended, even though he had a copy of the confidential information and did not notify Carr of the information's existence during the digital initiatives meeting, which he attended with Jehling. Doc.

82, Pl.'s Resp. 18.  Following Jehling's suspension, Carr spoke to Mayer to assure him that he was valued and a year after Jehling's termination, Mayer received a raise of $62,000. *Id.* at 17, 22. Finally, Jehling emphasizes that Mayer lied during the investigation into the confidential salary information, one of the reasons that Jehling was terminated. Doc. 82, Pl.'s Resp.19.  Specifically, on October 4, after the decision to terminate Jehling was made, Scott interviewed Mayer again and asked him if he had been in contact with Jehling since October 1. Doc. 74, Defs.' Br 18. Mayer told Scott that he had no contact with Jehling, although he had exchanged text messages. *Id.* Jehling also argues that Mayer lied about going to find Carr with Jehling after 5 p.m. on September 28 because Jehling had already left the building at that time, Doc. 82, Pl.'s Resp. 19, but Defendants suggest that Mayer was just mistaken about the time because Jehling admits that they went to seek out Carr in the afternoon on September 28. Doc. 74-6, Report Ex. A-4, at DMN079185.

## II.

### LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The substantive law governing a matter determines which facts are material to a case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The summary judgment movant bears the burden to prove that no genuine issue of material fact exists. *Latimer v. Smithkline & French Labs*, 919 F.2d 301, 303 (5th Cir. 1990). However, if the non-movant ultimately bears the burden of proof at trial, the summary judgment movant may satisfy its burden by pointing to the mere absence of evidence supporting the non-movant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Once the summary judgment movant has met this burden, the non-movant must "go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (per curiam) (citing *Celotex*, 477 U.S. at 325). In determining whether a genuine issue exists for trial, the court will view all of the evidence in the light most favorable to the non-movant. *Munoz v. Orr*, 200 F.3d 291, 302 (5th Cir. 2000). But the non-movant must produce more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the non-movant is unable to make such a showing, the court must grant summary judgment. *Little*, 37 F.3d at 1076.

## III.

## ANALYSIS

Defendants move for summary judgment on each of Plaintiff's claims: race discrimination under Title VII, FMLA interference and retaliation, breach of contract, and defamation. Plaintiff opposes summary judgment as to each claim. The Court analyzes each of the causes of action below.

A.      *Title VII Discrimination Claim*

Jehling first claims that Defendants discriminated against him when they terminated him based on his race in violation of Title VII. Defendants argue that they are entitled to summary judgment on this claim because Jehling cannot provide any direct or circumstantial evidence of discrimination. Moreover, Defendants argue that even if Jehling could make out a prima facie case of discrimination, he was terminated for a legitimate, nondiscriminatory reason. Additionally, Defendant A.H. Belo contends that it is entitled to summary judgment on this claim because it was not Jehling's "employer."

In order to survive summary judgment, a plaintiff presenting circumstantial evidence of employment discrimination must satisfy the burden-shifting framework set out in *McDonnell-Douglas Corp v. Green*, 411 U.S. 792, 802 (1973). Under the *McDonnell-Douglas* burden shifting framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. To do so, he must show that he "'(1) is a member of a protected class; (2) was qualified for [the] position; (3) was subject to an adverse employment action; and (4) was replaced by someone outside the protected class,' or, in the case of disparate treatment, . . . 'that others similarly situated were treated more favorably.'" *Okoye v. Univ. of Texas Houston Health Sci. Ctr.*, 245 F.3d 507, 512-13 (5th Cir. 2001); *see also Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 345 (5th Cir. 2007). Making this showing raises a presumption of discrimination that the employer must then rebut by articulating "some legitimate, nondiscriminatory reason" for the adverse employment decision. *McDonnell Douglas*, 411 U.S. at 802. If the employer is able to articulate a legitimate reason for dismissal, the plaintiff must provide sufficient evidence to create a genuine issue of material fact that either (1) the proffered reasons were not true, but a pretext for a racially discriminatory decision or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another "motivating" factor is the plaintiff's protected characteristic. *McDonnell Douglas*, 411 U.S. at 804; *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004).

1.    Prima Facie Case

Defendants do not contest that Jehling is a member of a protected class, that he was qualified for his former position, or that he suffered an adverse employment action. The parties' sole disagreement is whether a similarly-situated employee was treated more favorably than Jehling.

Similarly situated individuals must be "nearly identical" to the plaintiff and must fall outside the plaintiff's protected class. *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 406 (5th Cir. 2005). Employment actions occur under nearly identical circumstances "when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories." *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009). "If the 'difference between the plaintiff's conduct and that of those alleged to be similarly situated *accounts for* the difference in treatment received from the employer,' the employees are not similarly situated." *Id.* (emphasis in original).

While the parties apparently agree that Mayer and Jehling held similar positions and had the same supervisor, they disagree about whether the two employees engaged in similar conduct.[3] In support of his proposition that Mayer and he engaged in the same conduct, Jehling submits Mayer's deposition testimony, in which Mayer admits that he also had a copy of the confidential salary information, Doc. 83-12, Mayer Dep. Ex. F, at 24, and Mayer's schedule, which indicates that Mayer attended the digital initiatives meeting with Carr on September 28 and yet did not bring the information to Carr's attention. Doc. 83-10, Report Ex. B-12. Jehling also points to Defendants' admission that Mayer lied during the investigation about whether he had been in contact with Jehling, Doc. 74, Defs' Br. at 18, and further insists that Mayer lied when he stated that he accompanied Jehling to find Carr after 5 p.m. on September 28 because toll records show Jehling had left the building before 4 p.m. Doc. 83-9, Records Ex. B-8.

---

[3]Defendants also argue that if there were a similarly situated employee, it would be Sevki Inan. Although not necessarily relevant to the inquiry since Plaintiff does not claim similar activity with Inan, the Court concludes that Inan is not a similarly-situated employee because he was Jehling's subordinate and held a different position with distinct responsibilities.

Defendants rely upon Scott's investigation report in turn to demonstrate that Mayer did not have the same opportunities as Jehling to bring the information to Carr's attention. Doc. 74-6, Report Ex. A-4, at DMN079181. They also point to the employee accounts contained in the report to show that Jehling disseminated the information to Mayer, even though Carr admits in deposition testimony that there is no concrete evidence that Jehling provided Mayer with his copy of the salary information. *Id.* Finally, Defendants point to the Mayer and Scott's affidavits to show that Mayer cooperated in the investigation, and that, even if he did lie, Defendants were not aware of the lie until 18 months after the investigation was completed. Doc. 74-2, Scott Aff. Ex. A ¶ 14, Doc. 74-31, Mayer Aff. Ex. L ¶ 6.

The evidence referenced above may be sufficient to raise a fact issue as to whether Jehling and Mayer were similarly situated employees. However, since the Court decides Jehling's termination claim on the issue of pretext, it assumes without deciding whether Jehling has met this prong of his prima facie case.

### 2.   Defendants' Nondiscriminatory Reason for Terminating Jehling

The burden now shifts to Defendants to provide a legitimate, nondiscriminatory reason for Jehling's termination. *McDonnell Douglas*, 411 U.S. at 802. In evaluating whether the proposed reason is legitimate and nondiscriminatory, the Court looks at the facts known to Defendants at the time the decision was reached and whether Defendants believed in good faith that Jehling behaved in a particular way. *See Waggoner v. City of Garland*, 987 F.2d 1160, 1165 (5th Cir. 1993)."Even an incorrect belief that an employee's performance is inadequate constitutes a legitimate, nondiscriminatory reason." *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995).

Defendants allege that Jehling was terminated for his failure to immediately report the accessibility of the confidential salary information, and Jehling does not challenge that this is a legitimate, nondiscriminatory reason for terminating him. Doc. 82, Pl.'s Resp. 20-21. Instead, he argues that this reason is a pretext for Defendants' actual reasons for firing him, which are based on his race. Accordingly, the Court finds that Defendants have met their burden of providing a legitimate, nondiscriminatory reason for terminating Jehling.

> **3.**     **Jehling's Evidence Of Pretext**

The burden now shifts to Jehling to show that a genuine issue of fact exists as to whether Defendants' reasons for terminating him are actually a pretext for a racially discriminatory decision or whether Jehling's race was a motivating factor in Defendants' decision.     To support his claims that Defendants' reasons for terminating him were false and that the their real reasons were discriminatory, Jehling attacks Scott's investigative report, which he argues is rife with statements, omissions, and inconsistencies that evidence bias. Jehling also points to additional evidence of past racially charged incidents at DMN that he argues, when considered alongside Scott's report, show that Defendants' reasons for terminating him are mere pretext for terminating him based on his race.

Jehling points to various sections of Scott's report that he believes manifest that Scott was biased and that she targeted him throughout the investigation. For instance, he notes that Scott's narrative summary leaves out certain facts which were included in another HR representative's notes from the same interviews. Doc. 83-9, Report Ex. B-2, at DMN079173, DMN079186. He alleges further that Scott's report includes commentary attacking Jehling's credibility but not Mayer's; that Scott failed to note in the report that Mayer, like Jehling, had a copy of the information; that other employees who had access to or handled the salary information were not punished; that Scott

- 14 -

mentioned Jehling's alleged shoplifting to Carr to influence Carr's decision to terminate him; and that Scott failed to verify the truth of other employees' statements and sloppily recorded certain accounts. Doc. 83-9, Report Ex. B-2, at DMN079171-DMN079187; Doc. 83-11, Carr Dep. Ex. C, at 161. Jehling also tries to show that the investigation's conclusions were ultimately incorrect by providing deposition testimony that he repeatedly tried to meet with Carr on September 28, and that once he did he lacked sufficient time to tell her about the salary information. Doc. 83-12, Jehling Dep. Ex. E, at 193-195. He also submits deposition testimony from Carr and argues that it shows that she relied upon the investigation report and did not reach the decision to terminate Jehling unilaterally. Doc. 83-11, Carr Dep. Ex. C., at 84-85, 137, 151-52.

Jehling also presents evidence of a number of incidents outside of the investigative report as circumstantial evidence of Defendants' racial bias against him. He provides his own deposition testimony that he had reported previous instances of Bill Bradley making racially biased remarks, and that Defendants responded by failing to investigate and telling him to have a thick skin. Doc. 83-12, Jehling Dep. Ex. E, at 110-11, 113. He also provides a series of emails that he feels show that Bradley targeted a Hispanic employee and that Jehling tried to approach his managers with his concerns. Doc. 83-7, Email Ex. A-7.; Doc. 83-7, Email Exchange Ex. A-8. Jehling also submits the investigative report of the previous shoplifting investigation and argues that it too demonstrates racial animus. Doc. 83-9, Report Ex. B-9. Finally, he points to the differential treatment Mayer and other employees received for their behavior regarding the confidential salary investigation. Doc. 82, Pl.'s Resp. 22.

In response to Jehling's claims of pretext, Defendants rely upon Carr's deposition testimony that she alone made the decision to terminate Jehling. Doc. 74-11, Carr Dep. Ex. B, at 84-85. They

also provide the testimony of employees denying that they ever complained about Bradley targeting Hispanic employees or making racist remarks. Doc. 74-16, Pullias Dep. Ex. E., at 39-40, 48-49; Doc. 74-18, Inan Dep. Ex. G., at 29-30; Doc. 74-30, Mayer Dep. Ex. K, at 52-53. Defendants also point to the prior shoplifting investigation report to show that it was initiated for other concerns that employees had raised about Jehling's performance, including his alleged shoplifting. Doc. 83-9, Report Ex. B-9.

Based on the summary judgment evidence before it, the Court cannot conclude that Jehling has raised a genuine issue of material fact as to whether the reason for his termination was false and a pretext for Defendants' discriminatory motives. At the outset, the Court notes that the evidence generally shows that the "same actor" inference would apply because Carr made the decision to hire Jehling and to terminate him. Generally, where the same person hires and fires the plaintiff there is an inference that discrimination is not a factor in the person's decision to terminate the employee. *See Brown v. CSC Logic, Inc.*, 82 F.3d 651, 658 (5th Cir. 1996) (adopting the "same actor" inference). Jehling argues that the same actor inference does not apply for two reasons. First, he posits that while Carr alone decided to hire him, Carr, Scott, and another supervisor decided to fire him, and thus the prerequisites for the inference are not met. Second, Jehling claims that Scott's investigation was intentionally skewed to target him and that, because Carr relied on Scott's investigation, Scott's discriminatory motives should be imputed to Carr. *Long v. Eastfield Coll*ege, 88 F.3d 300, 307 (5th Cir. 1996). In assessing whether Scott's investigative report manifests bias and therefore reveals that Defendants' reasons for terminating Jehling are pretext, the Court must keep in mind that it is irrelevant whether the conclusions reached in the investigation were incorrect. *Waggoner*, 987 F.2d at 1165-66. "[T]he inquiry is limited to whether the employer believed the

allegation in good faith and whether the decision to discharge the employee was based on that belief". *Id.*; *Dickerson v. Metropolitan Dade County*, 659 F.2d 574, 581 (5th Cir. 1981).

With regards to Jehling's first argument that the same actor inference does not apply, his submitted evidence only shows that Carr had to have the approval of Scott and another supervisor to terminate Jehling. Doc. 83-11, Carr Dep. Ex. C, at 137, 151-52. Carr reaffirmed that she made the decision to hire him, and the she alone decided to terminate him. *Id.*

Jehling's argument that the inference does not apply because Scott's bias can be imputed to Carr also fails because he submits no evidence from which a reasonable observer could infer bias on Scott or Carr's part. Jehling relies heavily on Scott's report to show that Scott was biased against him, but a fair reading of the report reveals that, while there are minor inconsistencies throughout, it lacks any facial indications of bias. It generally reports the statements given by each employee involved in the incident and notes contradictions as Scott saw them when she was conducting the investigation. Jehling may contest the outcome of the investigation, but "the question is not whether an employer made an erroneous decision, it is whether the decision was made with discriminatory motive." *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995). More importantly, Jehling provides no evidence that Carr relied upon the report in bad faith or was unavoidably influenced by the report to act in a discriminatory manner when she reached the decision to terminate him. Instead, the evidence shows that the main reasons for Jehling's termination (his failure to disclose the confidential salary information to Carr in a timely manner despite having a number of opportunities) were already known to Carr before the investigation was complete and were confirmed by Jehling in the report. Doc. 74-12, Carr Aff. Ex. C ¶¶ 10-11; Doc. 74-2, Report Ex. A-4, at DMN079181-DMN079183. Carr then made the ultimate decision to terminate him

independently, and did not, as Jehling argues, act as a "rubber stamp" for Scott. Doc. 83-11, Carr Dep. Ex. C, at 151.

Jehling's testimony that he tried to contact Carr numerous times on September 28 does not demonstrate that Defendants' reasons for his termination are false or that the report was unfairly biased. Rather, the substantially undisputed evidence shows that the report correctly concluded that he failed to reveal the information to Carr when he had the chance. Jehling acknowledges that he met with Mayer before his one-on-one meeting with Carr and that he had verified that the salary information he had received was accurate and needed to be taken down. Doc. 82, Pl.'s Resp. 4. Yet, even after many attempts to contact Carr, when he finally did meet with her privately, he admits that he did not disclose the information's existence to her, although he insists that she cut him off and prevented him from speaking to her about the issue. Doc. 83-12, Jehling Dep. Ex. E, at 195. Even viewing the evidence in a light most favorable to Jehling, it is clear that Scott and Carr could conclude that Jehling failed under these circumstances to raise the issue when he had a chance. Again, Jehling may dispute the conclusions of the investigation, but a disagreement over whether Defendants' conclusions were erroneous is insufficient for a reasonable fact finder to infer that Defendants' justification for terminating Jehling was false. *Mayberry*, 55 F.3d at 1091.

The evidence Jehling submits concerning past racial incidents, Defendants' superior treatment of Mayer, and the prior investigation of Jehling similarly does not create a genuine issue of material fact as to whether Defendants' reasons for terminating him were pretextual. For example, the evidence that Jehling submits to show that Bradley acted discriminatorily and that other DMN supervisors turned a blind eye to it all does not raise a fact issue about pretext because it does not demonstrate that Defendants' employees engaged in a pattern of discriminatory behavior that would

have affected Carr or Scott in their investigation and decision to terminate Jehling. In fact, most of the evidence does not address race or racist behavior, and none of the evidence shows that Scott or Carr was biased against Jehling for his race. For instance, only Jehling's deposition testimony directly alleges racist acts or comments by Bradley or others, and this testimony is undermined by Defendants' evidence showing that other employees involved or targeted can not even recall these events happening. Doc. 74-16, Pullias Dep. Ex. E., at 39-40, 48-49; Doc. 74-18, Inan Dep. Ex. G., at 29-30; Doc. 74-30, Mayer Dep. Ex. K, at 52-53. As circumstantial proof of the alleged targeting and bias, Jehling submits a series of emails that he asserts shows targeting of a Hispanic employee, but none of these emails mention race or racial concerns and the majority instead revolve around concerns about selling strategies and confusion over ad campaigns. Doc. 83-7, Email Ex. A-7; Doc. 83-7, Email Exchange Ex. A-8. At most, the emails show that on one occasion DMN investigated an employee who happened to be Hispanic, and that Jehling requested to speak to one of his supervisors about a "sensitive topic," although the emails do not indicate what that topic was or whether it was race-related. Doc. 83-7, Email Exchange Ex. A-8. All of this evidence is not sufficient to raise an issue of fact about whether Defendants' employees had a history of discriminatory animus or whether the decision to terminate Jehling was infected by bias. While evidence of discriminatory remarks may be sufficient to demonstrate a pattern of discrimination, the value of such evidence depends on whether the remarks demonstrate animus and whether the speaker was principally responsible for the disputed adverse employment action. *Rios v. Rossotti*, 252 F.3d 375, 379 (5th Cir. 2001). Though Jehling also alleges that supervisors and HR staff were indifferent and did not investigate these disputed events, evidence of these few disputed incidents does not tend to show

a history of racial animus at DMN or that Scott and Carr were infected with bias when they made the decision to terminate him.

Jehling provides little additional evidence to support his claim that Scott and Carr acted indifferently in the incidents referenced above. He submits only an email exchange that does not mention race or a racial event and that did not include Scott or Carr and deposition testimony stating that he once complained to Carr about Bradley's racial comments. Doc. 83-7, Email Ex. A-9; Doc. 83-11, Jehling Dep. Ex. E, at 116, 149. All of this evidence, considered alongside Jehling's evidence of past racial incidents, allows for mere speculation about Defendants' motives in this case, and it is generally insufficient to raise a fact issue as to whether Defendants, Carr, or Scott were motivated by Jehling's race, even in part, in investigating or deciding to terminate Jehling.

Jehling's evidence that Defendants treated Mayer and others differently than Jehling adds little weight to Jehling's arguments because Defendants either had nondiscriminatory reasons for the differential treatment or the employees were not similarly situated to Jehling. As noted above, Defendants did not suspend or terminate Mayer for lying, as they did with Jehling, but that is because they did not discover that he had lied during the investigation until much later.  Doc. 74-2, Scott Aff. Ex. A ¶ 14; Doc. 74-31, Mayer Aff. Ex. L ¶¶ 6-7.  Jehling also stresses that Mayer was not punished for failing to disclose the information to Carr, even though Mayer remained in the building after Jehling left for the day on September 28 and could have theoretically met with Carr. Defendants' decision not to punish Mayer for failing to disclose the information does not show discriminatory animus, however, because, as Defendants' undisputed evidence shows, Mayer did try to bring the information to Carr's attention by accompanying Jehling on the afternoon of September 28. Doc. 74-6, Report Ex. A-4, at DMN079182. Mayer also could not have met with Carr after

Jehling left because she was in meetings all afternoon after she had a one-on-one meeting with Jehling. Doc. 83-2, Jehling Aff. Ex. A. ¶ 23. Thus, Defendants had nondiscriminatory bases for the disparate treatment, and Jehling points to nothing that raises a question of fact as to whether the different treatment was due, even in part, to his race.

The evidence surrounding the treatment of Jonathon Gonnet and John Maguire similarly does not indicate that Defendants treated Jehling differently based on his race. The evidence does show that Jonathon Gonnet, who found the salary information and delayed in reporting it to his superior, and John Maguire, who placed the information on the server, were treated differently from Jehling and were not terminated. Doc. 83-9, Report Ex. B-9, at DMN079184; Doc. 83-11, Carr Dep. Ex. C, at 161. The evidence also shows that both of these individuals were Caucasian. Doc. 82, Pl.'s Resp. 22. Defendants' offer no explanation for this different treatment, but it is undisputed that the two employees were not similarly situated to Jehling and that they did engage in different behavior with regards to the salary information. Moreover, the evidence shows that John Maguire placed the salary information on the server under the impression that it was secure, and that he was forthcoming when the investigation began. Doc. 83-9, Report Ex. B-9, at DMN079179. It is therefore unclear why Carr and the other supervisors chose not to discipline the two employees to the same extent as Jehling, but evidence of disparate treatment of non-similarly situated employees generally does not suggest that Defendants' reasons for terminating Jehling were false or motivated by discriminatory animus. *Walton*, 119 F.3d at 373 ("It is not discrimination to treat differently situated persons differently.")

Finally, the fact that Scott investigated Jehling for the alleged shoplifting incident does not show discriminatory intent because the past investigation was also based on legitimate concerns

raised by fellow employees about Jehling's attendance at work and his representations to other employees. Doc. 83-9, Report Ex. B-9, at DMN080424. Nothing in this earlier investigation report references Jehling's race or suggests that Defendants were targeting Jehling because of his protected status, either in that investigation or the later investigation into the confidential salary information.

Even viewed in a light most favorable to Jehling, the summary judgment evidence fails to raise a genuine issue of material fact as to whether Defendants' reasons for his termination were false or were motivated by discriminatory animus. The Court therefore **GRANTS** Defendants' Motion for Summary Judgment as to Jehling's Title VII claims. Because the Court grants Defendants' Motion as to Jehling's discrimination claims, it does not reach A.H. Belo's argument that it was not Jehling's employer under Title VII.

B.    *FMLA Claims*

The FMLA provides both prescriptive and proscriptive rights to eligible employees.  An employee's prescriptive rights encompass a series of entitlements and substantive rights, including a right to take up to 12 work weeks of leave in a 12-month period when a qualifying health condition occurs. 29 U.S.C. § 2615(a)(1); *Haley v. Alliance Compressor LLC*, 391 F.3d 644, 649 (5th Cir. 2004). An employee's proscriptive rights include "an employee's right not to be discriminated or retaliated against for having exercised the right to take FMLA leave." *Haley*, 391 F.3d at 649. Jehling asserts that Defendants violated his prescriptive rights by interfering with his right to take FMLA leave and his proscriptive rights by retaliating against him for asserting those rights.

1.    Interference Claim

A plaintiff may bring a claim for interference with his FMLA rights, if he can show (i) that he is an "eligible employee" under 29 U.S.C. § 2611(2); (ii) the defendant is a covered employer

under 29 U.S.C. § 2611(4); (iii) the employee was entitled to take leave under 29 U.S.C. § 2612(a)(1); (iv) the employee gave the employer notice of his intention to take leave as required under 29 U.S.C. § 2612(e)(1); and (v) the employer denied the employee FMLA benefits to which he was entitled. *See Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003). It is undisputed that DMN is a covered employer. The Court also assumes without deciding that Plaintiff has presented a material fact question as to whether his daughter had a qualifying medical condition at the time leave was requested.[4] The remaining contested issues are therefore whether Jehling was an eligible employee, whether he provided notice of his intention to take leave, and whether Defendants denied Jehling FMLA benefits to which he was entitled.

Under the FMLA, an employee is "any individual employed by an employer." 29 U.S.C. § 203(e)(1). An eligible employee is "an employee who has been employed (i) for at least 12 months by the employer . . . and (ii) for at least 1,250 hours of service with such employer during the previous 12-month period." 29 U.S.C. § 2611(2). A person who is no longer employed at the time he requests FMLA leave is not an eligible employee under the statute. *See Abdulbaki v. Regent Care Center of San Antonio II, L.P.*, No. SA-11-cv-0211 OLG(NN), 2012 WL 1076206, at *10 (W.D. Tex. March 29, 2012) (holding an employee ineligible for FMLA leave when he requested leave after the decision to terminate and actual termination occurred); *Brohm v. JH Properties*, 149 F.3d 517, 523 (6th Cir. 1998) (holding a former employee ineligible because he was terminated a week prior to seeking FMLA leave).

The parties dispute whether Jehling was still employed by Defendants at the time that he

---

[4]The parties dispute the medical needs of Jehling's daughter, whether she saw certain doctors, and whether certain procedures were discussed.

requested leave. Defendants submit evidence in the form of affidavits and an investigation report to show that the decision to terminate Jehling was made on October 1 and that Scott and Carr tried to call Jehling on the morning of October 4 to inform him of his termination, but were unable to reach him. Doc. 74-6, Report Ex. A-4, at DMN079184; Doc. 74-12, Carr Aff. Ex. C ¶¶ 12-13; Doc. 74-2, Scott Aff. Ex. A ¶¶ 9-11. They spoke to him later that day, but only after receiving his FMLA request. Doc. 74-12, Carr Aff. Ex. C ¶¶ 12; Doc. 74-2, Scott Aff. Ex. A ¶¶ 10, 12. Jehling, by contrast, presents two theories for finding that he was still an eligible employee at the time he sent his formal FMLA notice. First, he submits deposition testimony that he spoke to Carr before he sent his FMLA notice, and that she sounded jubilant and did not notify him of his termination. Doc. 83-12, Jehling Dep. Ex. E, at 276-77. Based on this evidence, Jehling posits that Carr only decided to terminate him after he told her that he was going to call her from his attorney's office to discuss taking leave. Doc. 82, Pl.'s Resp. 29. Second, Jehling argues that even if Carr had decided to terminate him on October 1, he was still an employee when he sent his FMLA notice because he had not yet received his formal termination notice. *Id.* at 28.

As to Jehling's first theory, the evidence that he submits is insufficient to create an issue of fact as to whether he was an employee at the time of his FMLA notice. Jehling presents no evidence to directly rebut Defendants' evidence that the decision to terminate him had been reached before October 1, but instead points to a phone call on October 4 in which Carr sounded "jubilant." Doc. 83-12, Jehling Dep. Ex. E, at 276-77. That Carr failed to inform him of his termination when she first spoke to him does not rebut Defendants' evidence that the decision to terminate Jehling had been reached earlier, however, but instead allows for mere speculation about Carr's reasons for not informing Jehling of his termination immediately.

Indeed, though Jehling asserts that Carr and Scott lied when they stated that they tried to contact him on the morning of October 4, the evidence shows that Scott and Carr did try to call Jehling and that they likely knew of his intentions to take FMLA leave before he ever spoke to Carr. When Jehling's supervisors placed him on suspension they told him that they would call him with the conclusions of the investigation on Monday, October 4, 2010. Doc. 74-6, Report Ex. A-4, at DMN079183. After deciding to terminate Jehling on Friday, October 1, Scott and Carr tried to contact Jehling on the morning of Monday, October 4, but he did not answer their calls. *Id.* at DMN079185; Doc. 74-12, Carr Aff. Ex. C ¶¶ 12-13; Doc. 74-2, Scott Aff. Ex. A ¶¶ 9-11. Though Jehling suggests in his brief that he spoke to Carr before he sent his FMLA notice and that Carr sounded "jubilant" in that phone call, his evidence only shows that he spoke to Carr after having first received her voice message and only after having spoken to Sevki Inan. Doc. 83-12, Jehling Dep. Ex. E, at 276-77. Jehling's evidence does not suggest a clear timeline for when the phone calls or his email requesting FMLA leave occurred with regards to one another. Defendants' evidence, by contrast, establishes a clear timeline showing that Carr spoke to Jehling after calling him twice that morning and receiving his FMLA notice. Doc. 74-6, Report Ex. A-4, at DMN079185; Doc. 74-12, Carr Aff. Ex. C ¶ 12. Also, Jehling does not indicate whether he and Carr spoke about his termination in their first conversation; he only states that he informed her he would return the call once he arrived at his attorney's office. Doc. 83-12, Jehling Dep. Ex. E, at 276-77; Doc. 74-6, Report Ex. A-4, at DMN079185. That Carr was "jubilant" in her initial conversation with Jehling on October 4 therefore does not suggest that she did not have any initial intentions to fire him. Rather, the evidence shows that she likely had already received his FMLA notice and would have had the same incentive to terminate him during the first call as in the second. And so while it remains

unclear exactly why Carr waited to tell Jehling about his termination until the second phone call, the evidence at least shows that she likely did not change her mind based on hearing that he would call her from his attorney's office. Jehling therefore fails to submit sufficient evidence to raise a question of fact as to when Carr and Scott determined to terminate him.

As to Jehling's second theory that he was still an employee when he sent his formal FMLA notice, the evidence shows that Jehling had been effectively terminated before he made his formal FMLA request and that he was therefore not an eligible employee. In *Green v. Medco Health Solutions of Texas, LLC*, this Court encountered an analogous case where an employee alleged that her employer had failed to accommodate her disability as required under the Americans with Disabilities Act. No. 3:11-cv-2432-B, 2013 WL 2317054 (N.D. Tex. May 27, 2013). Though the employee had requested accommodations days before her termination was processed, the Court found that she had been effectively terminated when her employer determined that she had violated its attendance policy and therefore warranted termination. The Court advised that "in situations where an employee's termination based on a legitimate, nondiscriminatory reason has been made effective but has not yet been processed, courts must not permit the employee to use the ADA as a shield from being fired by suddenly requesting an accommodation before the ink on her valid termination papers is dry." *Id.* at *12.

Though this case arises under the FMLA, the same principle applies. Similar to the plaintiff in *Green*, Jehling attempted to use the protections of the FMLA to shield himself from a foreseeable termination.  Regardless of whether he had been notified of his termination or not, Defendants had made the decision to terminate him, and the evidence shows that they had attempted to call him and take other steps towards his termination before he requested FMLA leave. *See Kennebrew v. New*

- 26 -

*York City Hous. Auth.*, No. 01-CIV-1654(JSR)(AJP), 2002 WL 265120 (S.D.N.Y. Feb. 26, 2002)

("No FMLA violation occurs where an employer has already decided to terminate the employee

before the employee requests FMLA leave."); *Paasch v. City of Safety Harbor*, 915 F. Supp. 315, 321

(M.D. Fla. 1995) aff'd sub nom. *Paasch v. City of Safety Harbor*, 78 F.3d 600 (11th Cir.). As noted,

Jehling has not submitted evidence sufficient to raise a fact issue as to when Carr reached the

decision to terminate him, and the Court will not permit Jehling to use the FMLA as a shield in

order to circumvent the termination decision that had already been reached days prior.

The Court also notes that, even if Jehling were an eligible employee, his termination would

not violate his prescriptive rights under the FMLA because "[a]n employee who requests or takes

protected leave under the FMLA is not entitled to any greater rights or benefits than he would be

entitled to had he not requested or taken leave." *Grubb v. Southwest Airlines*, 296 F. App'x 383, 391

(5th Cir. 2008) (citing *Serio v. Jojo's Bakery Restaurant*, 102 F.Supp.2d 1044 (S.D. Ind. 2000));

*Maldonado v. Frio Cnty.*, CIV.A.SA-02-CA1046XR, 2004 WL 1304951 at *4 (W.D. Tex. June 1,

2004) ("an employer is entitled to dismiss an employee for any lawful reason at any time, whether

before, during, or after an employee requests or takes leave pursuant to the FMLA, as long as the

employer does not discriminate or retaliate against the employee for requesting or taking such

leave."); *Gunnel v. Utah Valley State College*, 152 F.3d 1253, 1262 (10th Cir. 1998) (holding that an

employee who requests FMLA leave is entitled to no greater protections from termination than he

would be if he had not requested leave under the FMLA); *cf.* 29 C.F.R. § 825.216(a) (noting that

an employee may be laid off or prevented from returning to a shift that has been eliminated as long

as the action would have been taken in absence of FMLA leave). Defendants have provided a

legitimate reason for terminating Jehling that is completely unrelated to his requests to take FMLA

leave and Jehling's FMLA request provided him with no additional protection from adverse employment actions than he would have had otherwise.

Because no reasonable jury could conclude from the evidence that Jehling submits that he was still an eligible employee when he submitted his notice of intent to take FMLA leave, he fails to make out a prima facie case of interference under the FMLA. Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment as to Jehling's FMLA interference claim.

ii.   <u>Retaliation Claim</u>

To establish a prima facie case for FMLA retaliation, the plaintiff must show that "(1) she was protected under the FMLA; (2) she suffered an adverse employment decision; and either (3a) that she was treated less favorably than an employee who had not requested leave under the FMLA; or (3b) the adverse decision was made because she took FMLA leave." *Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 768 (5th Cir. 2001). As with Title VII claims, the *McDonnell-Douglas* framework applies to claims of retaliatory termination under the FMLA. *Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 332 (5th Cir. 2005).

Because Jehling cannot produce sufficient evidence to raise a fact issue as to whether he was an eligible employee under the FMLA when he sent his formal FMLA request, he also is unlikely to make out a prima facie case of retaliation because he can not show that he was "protected under the FMLA." The Court will assume *arguendo*, however, that Jehling can make out a prima facie case of FMLA retaliation, as it ultimately concludes that Jehling can not raise a fact issue as to whether Defendants' reasons for terminating him are pretext for retaliation based on his FMLA request.

Jehling does not argue that Defendants' proffered reasons for terminating him are not legitimate. Rather, he insists that these reasons are merely pretext for retaliating against him for

asserting his FMLA rights. In support of this proposition, Jehling offers deposition testimony stating that Carr was aware before September 28 that he intended to take time off to care for his daughter, that he spoke to her on the September 28 about taking time off, and that he had informed her that he needed to leave to take care of his daughter that day. Doc. 83-11, Jehling Dep. Ex. E, at 242, 270-273. He also asserts that he tried to speak with Carr before he was sent home prior to the investigation, but that he was denied the opportunity. Doc. 83-9, Report Ex. B-2, at DMN079175. Again, he alleges that when he spoke with Carr by phone on October 4 she was friendly and did not fire him until after he formally asserted his FMLA rights by e-mail later that day.  Doc. 83-11, Jehling Dep. Ex. E, at 276-77. Finally, he argues that the evidence he submitted of Defendants' preferential treatment of Mayer and of Scott's biased investigation, when considered in light of the close temporal proximity between his request for FMLA leave and his termination, also shows that Defendants' reasons for denying him benefits were merely pretext for their retaliatory motives. Doc. 82, Pl.'s Resp. 35.

Defendants respond, in turn, with affidavits stating that Jehling had not mentioned taking FMLA leave previously and that the decision to terminate him was made prior to his formal FMLA request. Doc. 74-2, Scott Aff. ¶¶ 9-10; Doc. 74-12, Carr Aff. ¶ 11. They also argue that Defendants could terminate him for a legitimate reason, regardless of when he took leave under the FMLA. Doc. 74, Defs.' Br. 28-29. They submit Carr's deposition testimony to show that Jehling was terminated for failing to disclose the confidential information to Carr and for disseminating the information to Mayer, and not for taking FMLA leave. Doc. 74-11, Carr. Dep. Ex. B, at 85-88.

Assuming that the notice that Jehling provided Defendants was sufficient,[5] Jehling's only real contention that Defendants' reasons for terminating him are pretext for retaliation is that there is suspiciously close timing between his FMLA request and his termination.   Temporal proximity is generally insufficient alone to establish pretext, however. *Wilson v. Noble Drilling Servs., Inc.*, 405 F. App'x 909, 914 (5th Cir. 2010); *see also Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 656 (5th Cir. 2004). Furthermore, while an employer may need to offer a legitimate, nondiscriminatory reason for the close timing between an employee's protected activity and an adverse employment action, *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 408 (5th Cir. 1999), Defendants have met their burden here by showing that after deciding to terminate Jehling, Carr and Scott made numerous attempts to contact Jehling about his termination but were unable to get him on the phone until after he sent his FMLA notice. Doc. 74-12, Carr Aff. Ex. C ¶¶ 12-13; Doc. 74-2, Scott Aff. Ex. A, ¶¶ 9-11. As explained above, the evidence tends to show that Carr had already received his FMLA request prior to first speaking with Jehling on October 4.   Doc. 74-6, Report Ex. A-4, at DMN079185; Doc. 74-12, Carr Aff. Ex. C ¶ 12. While it remains unclear exactly why Carr waited to tell Jehling about his termination until the second phone call that day, the evidence at least shows that she likely did not change her mind based on receiving Jehling's FMLA request in the period between her two phone conversations with him.

---

[5] Whether Jehling's repeated statements to Carr and others that he "may" need to take leave at some point were sufficient to give notice under the FMLA is questionable. *See* Doc. 83-12, Jehling Dep. Ex. E, at 270-73; *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990-91 (8th Cir. 2005) ("Employees thus have an 'affirmative duty to indicate both the need and the reason for the leave,' and must let employers know when they anticipate returning to their position."). The Court does not need to decide the issue of the sufficiency of Jehling's notice, however, because even if Jehling's notice was sufficient, he provides no evidence, direct or circumstantial, that would raise a question as to whether Defendants' reasons for terminating him were mere pretext for retaliation.

Jehling's evidence of Defendants' preferential treatment of Mayer and of Scott's allegedly biased report lend little weight his claims of retaliation. As noted above, Defendants chose to treat Mayer differently, but that is because they were largely unaware that he had lied during the investigation. Additionally, while he did have access to the confidential information, Jehling has not shown that Mayer failed to disclose the information in a one-on-one meeting with Carr, as he did. Also, as noted earlier, the inconsistencies in the investigation report of the confidential salary information do not demonstrate bias and Jehling presents little evidence to suggest that Carr was herself biased or was influenced by Scott's bias against him.

Because Jehling can not meet his burden of raising a genuine dispute of fact as to pretext, the Court concludes that Defendants have met their burden of demonstrating that they are entitled to summary judgment on Plaintiff's FMLA retaliation claim. The Court therefore **GRANTS** Defendants' Motion for Summary Judgment as to Jehling's FMLA retaliation claim.

C.      *Breach of Contract Claim*

Jehling seeks damages resulting from an alleged breach of contract for Defendants' failure to pay his quarterly bonuses after he was terminated. To support his position, Jehling submits an offer letter that he received when he first began working at DMN in 2008 and an earnings statement showing his earnings at the end of his employment. Doc. 83-2, Letter Ex. A-2; Doc. 83-7 Earnings Statement Ex. A-6. Jehling argues that the offer letter formed a unilateral contract, or at least was ambiguous enough to raise a fact issue as to when his rights to the bonus accrued, and that because he had already exceeded the performance mark for that year he was entitled to the promised bonus. Doc. 82, Pl.'s Resp. 37. Defendants present evidence that the offer letter Jehling received when he was "rehired" confirmed that his employment was "at will." Doc. 74-4, Letter Ex. A-2. Defendants

also offer evidence in the form of an affidavit that quarterly bonuses were only payable at the end

of a quarter and were not paid to former employees. Doc. 74-2, Scott Aff. Ex. A ¶5. From this

evidence, Defendants argue that Jehling is unable to establish that the offer letter formed a binding

contract and that his rights to the disputed bonus never accrued.

To prevail on a breach of contract claim under Texas law, a plaintiff must show "(1) the

existence of a valid contract; (2) performance or tentative performance by the plaintiff; (3) breach

of the contract by the defendant; and (4) damage resulting to the plaintiff from the breach." *Stewart

v. Sanmina Texas, L.P.*, 156 S.W.3d 198, 214 (Tex. App.–Dallas 2005, no pet.). "[A] unilateral

contract is created when a promisor promises a benefit if a promisee performs." *City of Houston v.

Williams*, 353 S.W.3d 128, 135 (Tex. 2011). Where an employer promises that an employee "shall"

be entitled to or "shall" receive specific benefits, a unilateral contract is created, *id.* at 138, but an

offer letter that simply informs an employee that he "will be eligible" for general benefits of

employment does not manifest sufficient intent to create a unilateral contract. *Parviz-Khyavi v. Alcon

Laboratories, Inc.*, 395 S.W.3d 376, 381 (Tex. App.–Dallas 2013).

It is unclear whether the language in the offer letter Jehling received from DMN was

sufficient to form a unilateral contract. While the letter explicitly states that it does not create a

binding employment contract, it also states that Jehling "*will* be a participant" in IPGM and "will be

*eligible* for a target bonus of $80,000 to be paid quarterly . . . [and] *eligible* to receive a 2% bonus of

all revenue over goal to be paid quarterly," Doc. 74-4, Letter Ex. A-2 (emphasis added). Though this

language apparently mirrors that of the offer letter in *Parviz-Khyaviv*, which the court determined

did not form a contract, the offer letter in *Parviz-Khyaviv* only stated that the employee would be

eligible for unidentified general benefits, not a specific benefit like a bonus. *See Parviz-Khyavi*, 395

S.W.3d at 381. The fact that the bonus was based on established financial targets and that DMN apparently did not retain discretion in whether to award the bonuses also raises a question as to whether the bonus provision in Jehling's offer letter constitutes an enforceable promise. *Shanklin v. Columbia Mgmt. Advisors, L.L.C.*, CIV.A. H-07-2690, 2008 WL 4899631 at *13 (S.D. Tex. Nov. 12, 2008) ("[T]he facts that there is [sic] a definite bonus formula, and no language stating that payment was in management's discretion, support construing the Summary Sheet as a contract between CMA and Shanklin to pay an incentive bonus."); *Jourdan v. Schenker Int'l, Inc.*, 71 F. App'x 308, 311 (5th Cir. 2003) ("Not every promise made in the context of at-will employment, however, is unenforceable.").

The Court does not need to decide whether the letter's language was sufficient to form a unilateral contract, however, because Jehling presents no evidence to support a finding that his rights to his bonus had accrued prior to his termination. *Jourdan*, 71 F. App'x at 312. Jehling has the burden of establishing that there was an enforceable contract that DMN breached when it failed to pay him his bonus. *Foster v. Centrex Capital Corp.*, 80 S.W.3d 140, 143-44 (Tex. App. 2002). Generally, a promise in an at-will employment context is illusory when the consideration for that promise is dependent on a period of continued employment. *Light v. Centel Cellular Co.*, 883 S.W.2d 642, 644-645 (Tex. 1994) abrogated on other grounds by *Alex Sheshunoff Mgmt. Services, LP, v. Johnson*, 209 S.W.3d 644 (Tex. 2006). This principle derives from the fact that in an at-will employment context, any additional period of employment is within the control of the employer. *Id.* at 644-45. Some promises in the at-will context are enforceable, however. *Jourdan*, 71 F. App'x at 312 ("that an employment contract is terminable at-will . . . does not mean that an employer can promise to pay an employee a certain wage and unilaterally decide to pay the employee less for work

she has already done.") (citations omitted). Because unilateral contracts are enforceable when the promisee performs, *Vanegas v. American Energy Services*, 302 S.W.3d 299, 302 (Tex. 2009), a court must determine when the promisee's rights under the contract would accrue in order to determine if a contract was ever formed.

Jehling claims that he had met the target entitling him to a bonus for the quarter in which he was terminated. To support his claim, he presents an offer letter that he received, which stated that he would be eligible for a "target bonus . . . to be paid quarterly." Doc. 82, Pl.'s Resp. 37.[6] While the letter's language is admittedly ambiguous as to when Jehling's right to quarterly bonuses could accrue, it does not establish whether his rights to his bonus had accrued when he was terminated. The additional evidence that Jehling submits similarly does not resolve the questions regarding the accrual of his rights to a bonus. He points to an earnings statement that he apparently received at the end of his employment at DMN, but he only cites to it generally and does not explain how the figures reported indicate that he was entitled to an additional bonus. An inspection of the document does not reveal any amounts still owing to Jehling or report that he had met the benchmarks entitling him to the bonus that he claims he is owed. Doc. 83-7, Earnings Statement Ex. A-6.

To rebut Jehling's claims to a bonus, Defendants offer affidavit testimony from Sandra Scott stating that quarterly bonuses were only payable at the end of a quarter and were not paid to former employees. Doc. 74-2, Scott Aff. Ex. A ¶5; *see also Jourdan v. Schenker Int'l, Inc.*, 275 Fed. App'x. 371, 374 (5th Cir. 2008) (upholding a district court's holding that rights under a bonus contract had

---

[6]Although Jehling cites to the offer letter that he received in 2008 when he first began working for DMN, he evidently meant to cite to the offer letter he received when he was "rehired." See Doc. 74-4, Letter Ex. A-2.

not accrued before an employee was terminated based on evidence showing that bonuses were generally not paid before the end of the year and that they had never been paid to a person not currently employed with the company). While this evidence does not undermine Jehling's unsupported claim that he had met the financial targets entitling him to a bonus for the final quarter of 2010, it at least demonstrates that Jehlin's rights to his bonus would not have accrued before the end of the quarter in which he was terminated. And without further evidence or explanation to show that his rights had accrued prior to his termination, Jehling has not created a fact issue as to whether a valid contract existed that Defendants breached. Accordingly, the Court **GRANTS** the Motion for Summary Judgment as to the breach of contract claim.

D.      *Defamation Claim*

Finally, Defendants move for summary judgment on Jehling's claim that he was defamed through the language in his termination letter stating that he was "being terminated for misconduct." Under Texas law, to prove a claim of defamation, a plaintiff must show that the defendant "(1) published a statement; (2) that was defamatory concerning the plaintiff; (3) while acting with either actual malice, if the plaintiff was a public official or public figure, or negligence, if the plaintiff was a private individual, regarding the truth of the statement." *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998). Libel is a defamation expressed in writing or other graphic form, that tends to injure a living person's reputation or impeach a person's honesty, integrity, or virtue. *See* Tex. Civ. Prac. & Rem. Code § 73.001. Publication to a third party is an essential element of defamation under a theory of libel. *Lyle v. Waddle,* 144 Tex. 90, 188 S.W.2d 770, 771 (1945). Publication is the "communication of defamatory words to someone other than the person defamed." BLACK'S LAW DICTIONARY 1348 (9th ed. 2009).

Jehling presents no evidence that the alleged defamatory statement was ever published to another person. Instead, he offers deposition testimony and an affidavit affirming that he has been unable to secure employment in the media industry, which he believes at least circumstantially indicates that the fact that he had been terminated for "misconduct" had been communicated to others outside of DMN. Doc. 83-1, Jehling Aff. Ex. A ¶ 37; Doc. 83-11, Jehling Dep. Ex. E, at 291-92. He also presents deposition testimony that he had heard secondhand from other employees after his termination that there were rumors he had been terminated for embezzlement. Doc. 83-11, Jehling Dep. Ex. E, at 299-30. Finally, he points to the language of Defendants' employee handbook, and argues that, contrary to what Defendants' allege in their brief, Defendants' policy did not require them to always provide only dates of employment and positions held in response to reference requests. Doc. 83-10, Handbook Ex. B-13, at 3.

In response to Jehling's claims, Defendants point to the lack of evidence of publication and Jehling's own admission that he was unaware of any other party receiving the letter containing the alleged defamatory statement. Doc. 83, Defs.' Br. 33; Doc. 74-15, Jehling Dep. Ex. D., at 289-90. In order to show that they did not communicate the defamatory statement to others and that they were not likely to do so, Defendants also provide evidence that Jehling failed to inform his new employers that he had been terminated from DMN and that he had directed prospective employers to not contact DMN when he applied. Doc. 74-27, Application Ex. I-7, at DMN000319; Doc. 74-28, Application Ex. I-8, at DMN078463.

Even when considered in a light most favorable to Jehling, the evidence cannot raise a genuine dispute of fact as to whether the defamatory statement was published. Showing that Defendants had the capacity to publish and submitting hearsay evidence of secondhand rumors is

not sufficient to create a factual dispute. *Westfall v. GTE North Inc.*, 956 F.Supp. 707, 714 (N.D. Tex. Aug. 1, 1996) (rejecting a defamation claim that was based on rumors that were passed between current employees as to the reasons for a former employee's termination). Showing that Jehling could not secure a job in the media industry similarly does not rise to the level necessary to create a factual dispute because it does not suggest either way whether Defendants published the defamatory statement to others.

Jehling maintains, however, that DMN at least negligently published the defamatory statement because the statement in his termination letter will inevitably be disclosed to a prospective employer. He relies upon the negligent publication rule, a facet of Texas law which holds that

> If a reasonable person would recognize that an act creates an unreasonable risk that the defamatory matter will be communicated to a third person, the conduct becomes a negligent communication. A negligent communication amounts to a publication just as effectively as an intentional communication.

*Frakes v. Crete Carrier Corp.*, 579 F.3d 426, 432 (5th Cir. 2009) (citing RESTATEMENT (SECOND) OF TORTS § 577, cmt. k (1977)). According to Jehling's theory, he would not need to submit evidence of Defendants publishing the statement to others. Rather, merely sending the termination letter to Jehling would be sufficient to establish a defamation claim because the reasons for Jehling's termination would always be a "natural inquiry" for a future employer. Doc. 82, Pl.'s Resp. 40-41.

Jehling's reliance upon the negligent publication rule is misplaced for a number of reasons. First, communicating the reasons for Jehling's termination to him does not create an "unreasonable risk" of publication, but instead is a commonplace and proper employment practice. Any risk that the reasons for termination stated in the letter will be communicated to a third person are entirely

"reasonable" under the circumstances, and therefore would not seem to fall within the language cited in *Frakes*.

Second, Jehling's insistence that the negligent publication rule applies because the termination letter makes the defamatory statement a matter of "natural inquiry" misstates the status of the law. In *Frakes v. Crete Carrier Corp*, the Fifth Circuit found that "Texas courts have generally applied the negligent-publication rule to a particular situation–specifically, one in which the defendant performs some act that creates an unreasonable risk that a defamatory statement will be communicated *through the act itself*." 579 F.3d at 433. Sending Jehling a letter stating the reasons for his termination does not, in and of itself, create a greater risk that the defamatory statement will be communicated to a third-party. Placing Jehling's termination letter in his employee file also does not make the risk of disclosure unreasonable, especially when one considers Defendants' evidence that when DMN receives requests for employment reference checks, its normal practice is to "verify dates of employment and position(s) held," not reasons for termination. Doc. 74-3, Handbook Ex. A-3, at 3.

Jehling raises the case of *First State Bank v. Ake*, 606 S.W.2d 696 (Tex. App.–Corpus Christi, 1980) to support his position that because the reasons for his termination are a natural inquiry for any future employer, DMN can be deemed to have negligently communicated that he was terminated for misconduct. While the language of *Ake* does apparently support this position, that case differs from the case here because in *Ake* the plaintiff had already self-published the defamatory statement, whereas here Jehling only might self-publish in the future. In addition, beyond obviating the need for publication, Jehling's proposed rule would disrupt Texas rules on self-publication. Most Texas courts only recognize self-publication when (1) the defamed person who transmits the

defamatory statement does so without being aware of the defamatory nature of the matter, and (2) the circumstances indicate that communication to a third party is likely. *Express One Int'l, Inc. v. Galland, Kharasch, Morse & Garfinkle, PC*, No. 3:94-cv-1900-P, 1999 WL 794876 at *4 (N.D. Tex. Oct. 5, 1999); *Doe v. SmithKline Beecham Corp.*, 855 S.W.2d 248, 259 (Tex. App.–Austin 1993); *Austin v. Inet Technologies*, Inc., 118 S.W.3d 491, 499 (Tex. App.–Dallas 2003, no pet.); *AccuBanc Mortgage Corp. v. Drummonds*, 938 S.W.2d 135, 149 (Tex. App.–Fort Worth, no writ). As articulated by the *Doe* court, if awareness of the defamatory character of the statement is not considered, "the defamed party is under no duty to mitigate its damages by refraining to self-publish known defamatory statements." *Doe*, 855 S.W.2d at 259. Such a rule puts the plaintiff in a position to unfairly impose liability on a defendant who refrained from repeating the remarks by intentionally disclosing them.  The Court is unwilling to make such a drastic break from the majority approach in Texas law, and therefore it rejects Jehling's claims that the statement has been published under the negligent communication rule.

Third, even if the letter's language created some risk of communication to a third party, it is a protected communication under a qualified privilege. Employers who make otherwise defamatory statements during the course of investigating a report of wrongdoing by an employee enjoy a qualified privilege to defamation claims. *Randall's Food Markets, Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995). This privilege exists "as long as communications pass only to persons having an interest or duty in the matter to which the communications relate." *Id.* If the statement was motivated by actual malice, however, the privilege is lost. *Id.* "In the defamation context, a statement is made with actual malice when the statement is made with knowledge of its falsity or with reckless disregard as to its truth." *Id.* (citing *Hagler v. Procter & Gamble Mfg. Co.*, 884 S.W.2d 771 (Tex. 1994)); *see also*

*Frakes*, 579 F.3d at 430. Where malice is premised on a reckless disregard for the truth, the plaintiff must show that the alleged defamer did more than depart "from reasonably prudent conduct" but "in fact entertained serious doubts as to the truth of his publication" and "actually had a high degree of awareness of the probable falsity of his statements." *Bentley v. Bunton*, 94 S.W.3d 561, 591 (Tex. 2002) (internal citations, footnotes, and alterations omitted). The fundamental inquiry goes to the defendant's "doubt about the truth of the statement at the time they are made." *Id*. at 596. "A failure to investigate fully is not evidence of actual malice; a purposeful avoidance of the truth is." *Id*. Therefore, when an employer conducts an investigation leading to an accusation, if there is no evidence that the employer in fact doubted the truth of the charge, there cannot be actual malice. *Frakes*, 579 F.3d at 432. Further, "malice cannot be inferred from falsity of the statement alone." *Austin*, 118 S.W.3d at 497-98.

At the summary judgment stage, Jehling bears the burden of putting forth sufficient evidence to create a dispute as to the existence of actual malice. *Frakes*, 579 F.3d at 430-31. Jehling relies on the evidence he has submitted of prior racially charged incidents at DMN, of the different treatment Mayer received, and of Scott's "biased" investigation to show that his supervisors knew that the statement that he was "terminated for misconduct" was false when they made it. This argument, of course, assumes that the investigation itself was biased and that the real reason for Jehling's termination was discriminatory. Doc. 82, Pl.'s Resp. 44. In response, the Defendants argue that none of this evidence demonstrates actual malice. Doc. 74, Defs.' Resp. 36.

Jehling has failed to submit sufficient evidence to create a fact issue as to actual malice. Jehling apparently believes that the evidence he submits of past alleged discrimination is sufficient to raise a question as to whether Defendants and their employees are unavoidably biased against him,

but, as the Court noted with regards to Jehling's discrimination claims, this is not the case. Jehling's reliance on past targeting of himself and other Hispanic employees does not demonstrate that Defendants doubted the truth of the statement in this instance or that they believed it to be false. Moreover, Scott's investigation, while partially inconsistent with later deposition testimony, is not tainted with bias. Contrary to Jehling's claims that the investigation targeted him unfairly, Scott initiated the investigation promptly and gathered substantial circumstantial and direct evidence from other employees and Jehling indicating that he had delayed in notifying Carr of the confidential salary information and that he had disseminated that information to another manager. At most, the inconsistencies between Scott's record and the deposition testimony only indicate that Scott's investigation may have been inadequate or negligent, which is not sufficient for finding actual malice. *Frakes*, 539 F.3d at 432. Finally, evidence of the differential treatment that Mayer received does not show bad faith or reckless disregard on the part of Defendants because, as noted above, Defendants had legitimate reasons for treating the two employees differently.

As there is no evidence that the allegedly defamatory statement in Jehling's termination letter was published, and because the negligent publication rule does not apply, Jehling's defamation claim fails as a matter of law. Defendants' Motion for Summary Judgment as to the defamation claim is **GRANTED**.

## IV.

## CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment (doc. 73) is **GRANTED** as to all claims.

- 41 -

SO ORDERED.

SIGNED: October 28, 2013.

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE